(Slip Opinion)            OCTOBER TERM, 2014            1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## M&G POLYMERS USA, LLC, ET AL. *v.* TACKETT ET AL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 13–1010.   Argued November 10, 2014—Decided January 26, 2015

When petitioner M&G Polymers USA, LLC (M&G), purchased the Point Pleasant Polyester Plant in 2000, it entered a collective-bargaining agreement and related Pension, Insurance, and Service Award Agreement (P & I agreement) with respondent union. As relevant here, the P & I agreement provided that certain retirees, along with their surviving spouses and dependents, would "receive a full Company contribution towards the cost of [health care] benefits"; that such benefits would be provided "for the duration of [the] Agreement"; and that the agreement would be subject to renegotiation in three years.

Following the expiration of those agreements, M&G announced that it would require retirees to contribute to the cost of their health care benefits. Respondent retirees, on behalf of themselves and others similarly situated, sued M&G and related entities, alleging that the P & I agreement created a vested right to lifetime contribution-free health care benefits.

The District Court dismissed the complaint for failure to state a claim, but the Sixth Circuit reversed based on the reasoning of its earlier decision in *International Union, United Auto, Aerospace, & Agricultural Implement Workers of Am.* v. *Yard-Man, Inc.*, 716 F. 2d 1476. On remand, the District Court ruled in favor of the retirees, and the Sixth Circuit affirmed.

*Held*: The Sixth Circuit's decision rested on principles that are incompatible with ordinary principles of contract law. Pp. 5–14.

  (a) The Employee Retirement Income Security Act of 1974 (ERISA) governs pension and welfare benefits plans, including those established by collective-bargaining agreements. ERISA establishes minimum funding and vesting standards for pension plans, but exempts

welfare benefits plans—which provide the types of benefits at issue here—from those rules. See 29 U. S. C. §§1051(1), 1053, 1081(a)(2), 1083. "[E]mployers have large leeway to design . . . welfare plans as they see fit." *Black & Decker Disability Plan* v. *Nord*, 538 U. S. 822, 833. Pp. 5–7.

(b) This Court interprets collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy. See *Textile Workers* v. *Lincoln Mills of Ala.,* 353 U. S. 448, 456–457. When a collective-bargaining agreement is unambiguous, its meaning must be ascertained in accordance with its plainly expressed intent. 11 R. Lord, Williston on Contracts §30:6, p. 108. P. 7.

(c) In *Yard-Man,* the Sixth Circuit found a provision governing retiree insurance benefits ambiguous as to the duration of those benefits; and, looking to other provisions of the agreement, purported to apply ordinary contract law to resolve the ambiguity. First, the court inferred from the existence of termination provisions for other benefits that the absence of a termination provision specifically addressing retiree benefits expressed an intent to vest those benefits for life. The court then purported to apply the rule that contracts should be interpreted to avoid illusory promises, reasoning that, absent vesting, the promise would be illusory for the subset of retirees who would not become eligible for those benefits before the contract expired. Finally, the court relied on "the context" of labor negotiations to resolve the ambiguity, inferring that the parties would have intended such benefits to vest for life because they are not mandatory subjects of collective bargaining; are "typically understood as a form of delayed compensation," 716 F. 2d, at 1482; and are keyed to the acquisition of retirement status. The court concluded that these contextual clues "outweigh[ed] any contrary implications derived from a routine duration clause." *Id.,* at 1483. The Sixth Circuit has since extended its *Yard-Man* analysis in a series of other cases. Pp. 7–10.

(d) The inferences applied in *Yard-Man* and its progeny do not represent ordinary principles of contract law. *Yard-Man* distorts the attempt to ascertain the intention of the parties by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements. Rather than relying on known customs and usages in a particular industry as proven by the parties, the *Yard-Man* court relied on its own suppositions about the intentions of parties negotiating retiree benefits. It then compounded the error by applying those suppositions indiscriminately across industries. Furthermore, the Sixth Circuit's refusal to apply general durational clauses to provisions governing retiree benefits distorts an agreement's text and con-

flicts with the principle that a written agreement is presumed to encompass the whole agreement of the parties.

Perhaps tugged by its inferences, the Sixth Circuit also misapplied the illusory promises doctrine. It construed provisions that admittedly benefited some class of retirees as "illusory" merely because they did not benefit *all* retirees. That interpretation is a contradiction in terms—a promise that is "partly illusory" is by definition not illusory. And its use of this doctrine is particularly inappropriate in the context of collective-bargaining agreements, which often include provisions inapplicable to some category of employees.

The Sixth Circuit also failed even to consider other traditional contract principles, including the rule that courts should not construe ambiguous writings to create lifetime promises and the rule that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," *Litton Financial Printing Div., Litton Business Systems, Inc.* v. *NLRB*, 501 U. S. 190, 207. Pp. 10–14.

(e) Though there is no doubt that *Yard-Man* and its progeny affected the outcome here, the Sixth Circuit should be the first to review the agreements under ordinary principles of contract law. P. 14.

733 F. 3d 589, vacated and remanded.

THOMAS, J., delivered the opinion for a unanimous Court. GINSBURG, J., filed a concurring opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–1010

## M&G POLYMERS USA, LLC, ET AL., PETITIONERS *v.* HOBERT FREEL TACKETT ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 26, 2015]

JUSTICE THOMAS delivered the opinion of the Court.

This case arises out of a disagreement between a group of retired employees and their former employer about the meaning of certain expired collective-bargaining agreements. The retirees (and their former union) claim that these agreements created a right to lifetime contribution-free health care benefits for retirees, their surviving spouses, and their dependents. The employer, for its part, claims that those provisions terminated when the agreements expired. The United States Court of Appeals for the Sixth Circuit sided with the retirees, relying on its conclusion in *International Union, United Auto, Aerospace, & Agricultural Implement Workers of Am.* v. *Yard-Man, Inc.*, 716 F. 2d 1476, 1479 (1983), that retiree health care benefits are unlikely to be left up to future negotiations. We granted certiorari and now conclude that such reasoning is incompatible with ordinary principles of contract law. We therefore vacate the judgment of the Court of Appeals and remand for it to apply ordinary principles of contract law in the first instance.

# I

## A

Respondents Hobert Freel Tackett, Woodrow K. Pyles, and Harlan B. Conley worked at (and retired from) the Point Pleasant Polyester Plant in Apple Grove, West Virginia (hereinafter referred to as the Plant). During their employment, respondent United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, or its predecessor unions (hereinafter referred to as the Union), represented them in collective bargaining. Tackett and Pyles retired in 1996, and Conley retired in 1998. They represent a class of retired employees from the Plant, along with their surviving spouses and other dependents. Petitioner M&G Polymers USA, LLC, is the current owner of the Plant.

When M&G purchased the Plant in 2000, it entered a master collective-bargaining agreement and a Pension, Insurance, and Service Award Agreement (P & I agreement) with the Union, generally similar to agreements the Union had negotiated with M&G's predecessor. The P & I agreement provided for retiree health care benefits as follows:

> "Employees who retire on or after January 1, 1996 and who are eligible for and receiving a monthly pension under the 1993 Pension Plan . . . whose full years of attained age and full years of attained continuous service . . . at the time of retirement equals 95 or more points will receive a full Company contribution towards the cost of [health care] benefits described in this Exhibit B–1 . . . . Employees who have less than 95 points at the time of retirement will receive a reduced Company contribution. The Company contribution will be reduced by 2% for every point less than 95. Employees will be required to pay the balance of

the health care contribution, as estimated by the Company annually in advance, for the [health care] benefits described in this Exhibit B–1. Failure to pay the required medical contribution will result in cancellation of coverage." App. 415–416.

Exhibit B–1, which described the health care benefits at issue, opened with the following durational clause: "Effective January 1, 1998, and for the duration of this Agreement thereafter, the Employer will provide the following program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits for eligible employees and their dependents . . . . " *Id.,* at 377–378 (emphasis deleted). The P & I agreement provided for renegotiation of its terms in three years.[1]

## B

In December 2006, M&G announced that it would begin requiring retirees to contribute to the cost of their health care benefits. Respondent retirees, on behalf of themselves and others similarly situated, sued M&G and related entities, alleging that the decision to require these contributions breached both the collective-bargaining agreement and the P & I agreement, in violation of §301 of the Labor Management Relations Act, 1947 (LMRA) and §502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 891.[2] Specifically, the retirees alleged that M&G had promised to provide lifetime contribution-free health care benefits for them, their surviving spouses, and their dependents. They pointed to

_____

[1] In accordance with this provision, M&G and the Union began bargaining anew in 2003, ultimately reaching a new agreement in 2005. The provisions of the existing agreements remained in effect during the course of those negotiations. See App. to Pet. for Cert. 25, n. 1.

[2] The Union was a plaintiff in the suit and is a respondent here. For ease of reference, we refer to the respondents collectively as "the retirees."

the language in the 2000 P & I agreement providing that employees with a certain level of seniority "will receive a full Company contribution towards the cost of [health care] benefits described in . . . Exhibit B–1." The retirees alleged that, with this promise, M&G had created a vested right to such benefits that continued beyond the expiration of the 2000 P & I agreement.

The District Court dismissed the complaint for failure to state a claim. 523 F. Supp. 2d 684, 696 (SD Ohio 2007). It concluded that the cited language unambiguously did not create a vested right to retiree benefits.

The Court of Appeals reversed based on the reasoning of its earlier decision in *Yard-Man*. 561 F. 3d 478 (CA6 2009) (*Tackett I*). *Yard-Man* involved a similar claim that an employer had breached a collective-bargaining agreement when it terminated retiree benefits. 716 F. 2d, at 1478. Although the court found the text of the provision in that case ambiguous, it relied on the "context" of labor negotiations to resolve that ambiguity in favor of the retirees' interpretation. *Id.,* at 1482. Specifically, the court inferred that parties to collective bargaining would intend retiree benefits to vest for life because such benefits are "not mandatory" or required to be included in collective-bargaining agreements, are "typically understood as a form of delayed compensation or reward for past services," and are keyed to the acquisition of retirement status. *Ibid.* The court concluded that these inferences "outweigh[ed] any contrary implications [about the termination of retiree benefits] derived from" general termination clauses. *Id.*, at 1483.

Applying the *Yard-Man* inferences on review of the District Court's dismissal of the action, the Court of Appeals concluded that the retirees had stated a plausible claim. *Tackett I,* 561 F. 3d, at 490. "Keeping in mind the context of the labor-management negotiations identified in *Yard-Man*," the court found "it unlikely that [the Union]

would agree to language that ensures its members a 'full Company contribution,' if the company could unilaterally change the level of contribution." *Ibid.* The court construed the language about "employees" contributing to their health care premiums as limited to employees who had not attained the requisite seniority points to be entitled to a full company contribution. *Ibid.* And it discerned an intent to vest lifetime contribution-free health care benefits from provisions tying eligibility for health care benefits to eligibility for pension benefits. *Id.*, at 490–491.

On remand, the District Court conducted a bench trial and ruled in favor of the retirees. It declined to revisit the question whether the P & I agreement created a vested right to retiree benefits, concluding that the Court of Appeals had definitively resolved that issue. It then issued a permanent injunction ordering M&G to reinstate contribution-free health care benefits for the individual respondents and similarly situated retirees. 853 F. Supp. 2d 697 (SD Ohio 2012).

The Court of Appeals affirmed, concluding that, although the District Court had erred in treating *Tackett I* as a conclusive resolution of the meaning of the P & I agreement, it had not erred in "presum[ing]" that, "in the absence of extrinsic evidence to the contrary, the agreements indicated an intent to vest lifetime contribution-free benefits." 733 F. 3d 589, 600 (CA6 2013) (*Tackett II*). And because the District Court had concluded that the proffered extrinsic evidence was inapplicable, it had not clearly erred in finding that the agreement created those vested rights.

We granted certiorari, 572 U. S. \_\_\_ (2014), and now vacate and remand.

## II

This case is about the interpretation of collective-bargaining agreements that define rights to welfare bene-

fits plans. The LMRA grants federal courts jurisdiction to resolve disputes between employers and labor unions about collective-bargaining agreements. 29 U. S. C. §185. When collective-bargaining agreements create pension or welfare benefits plans, those plans are subject to rules established in ERISA. ERISA defines pension plans as plans, funds, or programs that "provid[e] retirement income to employees" or that "resul[t] in a deferral of income." §1002(2)(A). It defines welfare benefits plans as plans, funds, or programs established or maintained to provide participants with additional benefits, such as life insurance and disability coverage. §1002(1).

ERISA treats these two types of plans differently. Although ERISA imposes elaborate minimum funding and vesting standards for pension plans, §§1053, 1082, 1083, 1084, it explicitly exempts welfare benefits plans from those rules, §§1051(1), 1081(a)(1). Welfare benefits plans must be "established and maintained pursuant to a written instrument," §1102(a)(1), but "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans," *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U. S. 73, 78 (1995). As we have previously recognized, "[E]mployers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan* v. *Nord*, 538 U. S. 822, 833 (2003). And, we have observed, the rule that contractual "provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [welfare benefits] plan." *Heimeshoff* v. *Hartford Life & Accident Ins. Co.*, 571 U. S. ___, ___ (2013) (slip op., at 7). That is because the "focus on the written terms of the plan is the linchpin of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [welfare benefits] plans in the first place." *Id.,* at ___ (slip op., at 8) (internal quotation marks, brackets, and citation

omitted).

We interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy. See *Textile Workers* v. *Lincoln Mills of Ala.*, 353 U. S. 448, 456–457 (1957). "In this endeavor, as with any other contract, the parties' intentions control." *Stolt-Nielsen S. A.* v. *Animal-Feeds Int'l Corp.*, 559 U. S. 662, 682 (2010) (internal quotation marks omitted). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." 11 R. Lord, Williston on Contracts §30:6, p. 108 (4th ed. 2012) (Williston) (internal quotation marks omitted).

In this case, the Court of Appeals applied the *Yard-Man* inferences to conclude that, in the absence of extrinsic evidence to the contrary, the provisions of the contract indicated an intent to vest retirees with lifetime benefits. *Tackett II*, 733 F. 3d, at 599–600. As we now explain, those inferences conflict with ordinary principles of contract law.

## III

### A

#### 1

The Court of Appeals has long insisted that its *Yard-Man* inferences are drawn from ordinary contract law. In *Yard-Man* itself, the court purported to apply "traditional rules for contractual interpretation." 716 F. 2d, at 1479. The court first concluded that the provision governing retiree insurance benefits—which stated only that the employer "will provide" such benefits—was ambiguous as to the duration of those benefits. *Id.,* at 1480. To resolve that ambiguity, it looked to other provisions of the agreement. The agreement included provisions for terminating active employees' insurance benefits in the case of layoffs

and for terminating benefits for a retiree's spouse and dependents in case of the retiree's death before the expiration of the collective-bargaining agreement, but no provision specifically addressed the duration of retiree health care benefits. *Id.,* at 1481–1482. From the existence of these termination provisions and the absence of a termination provision specifically addressing retiree benefits, the court inferred an intent to vest those retiree benefits for life.

The court then purported to apply the rule that contracts should be interpreted to avoid illusory promises. It noted that the retiree insurance provisions "contain[ed] a promise that the company will pay an early retiree's insurance upon such retiree reaching age 65 but that the retiree must bear the cost of company insurance until that time." *Id.,* at 1481. Employees could retire at age 55, but the agreement containing this promise applied only for a 3-year term. *Ibid.* Thus, retirees between the ages of 55 and 62 would not turn 65 and become eligible for the company contribution before the 3-year agreement expired. In light of this fact, the court reasoned that the promise would be "completely illusory for many early retirees under age 62" if the retiree benefits terminated when the contract expired. *Ibid.*

Finally, the court turned to "the context" of labor negotiations. *Id.,* at 1482. It observed that "[b]enefits for retirees are . . . not mandatory subjects of collective bargaining" and that "employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees." *Ibid.* Based on these observations, the court concluded that "it is unlikely that such benefits . . . would be left to the contingencies of future negotiations." *Ibid.* It also asserted that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained." *Ibid.*

Although the contract included a general durational clause—meaning that the contract itself would expire at a set time—the court concluded that these contextual clues "outweigh[ed] any contrary implications derived from a routine duration clause." *Id.*, at 1483.

2

Two years after *Yard-Man*, the court took this analysis even further. In a dispute between retirees and a steel company over retiree health insurance benefits, it construed the language "will continue to provide at its expense, supplemental medicare and major medical benefits for Pensioners aged 65 and over" to "*unambiguously* confe[r]" lifetime benefits. *Policy* v. *Powell Pressed Steel Co.*, 770 F. 2d 609, 615 (CA6 1985) (emphasis added). Yet it had interpreted similar language—"will provide insurance benefits equal to the active group"—to be *ambiguous* in *Yard-Man*. The court refused to give any weight to provisions that supported a contrary construction—namely, one establishing a fund to pay pension, but not welfare, benefits, and another providing for the continuation of pension, but not welfare, benefits after the agreement expired. *Policy,* 770 F. 2d, at 615–616. According to the court, a contrary interpretation "would render the Company's promise [of benefits for retirees aged 65 and over] in substantial part nugatory and illusory" to retirees who were 62 or younger when the 3-year agreement was signed. *Ibid.* And it faulted the District Court for failing "to give effect" to *Yard-Man*'s admonition "that retiree benefits normally . . . are interminable." 770 F. 2d, at 616.

The Court of Appeals has continued to extend the reasoning of *Yard-Man*. Relying on *Yard-Man*'s statement that context considerations outweigh the effect of a general termination clause, it has concluded that, "'[a]bsent specific durational language referring to retiree benefits themselves,' a general durational clause *says nothing*

about the vesting of retiree benefits." *Noe* v. *PolyOne Corp.*, 520 F. 3d 548, 555 (CA6 2008) (emphasis added). It has also held that a provision that "ties eligibility for retirement-health benefits to eligibility for a pension . . . [leaves] little room for debate that retirees' health benefits ves[t] upon retirement." *Id.*, at 558 (internal quotation marks omitted). Commenting on these extensions of *Yard-Man*, the court has acknowledged that "there is a reasonable argument to be made that, while th[e] court has repeatedly cautioned that *Yard-Man* does not create a presumption of vesting, [it] ha[s] gone on to apply just such a presumption." *Cole* v. *ArvinMeritor, Inc.*, 549 F. 3d 1064, 1074 (CA6 2008).

B

We disagree with the Court of Appeals' assessment that the inferences applied in *Yard-Man* and its progeny represent ordinary principles of contract law.

As an initial matter, *Yard-Man* violates ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements. That rule has no basis in ordinary principles of contract law. And it distorts the attempt "to ascertain the intention of *the parties.*" 11 Williston §30:2, at 18 (emphasis added); see also *Stolt-Nielsen*, 559 U. S., at 682. *Yard-Man*'s assessment of likely behavior in collective bargaining is too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention.

And the Court of Appeals derived its assessment of likely behavior not from record evidence, but instead from its own suppositions about the intentions of employees, unions, and employers negotiating retiree benefits. See *Yard-Man*, 716 F. 2d, at 1482. For example, it asserted, without any foundation, that, "when . . . parties contract for benefits which accrue upon achievement of retiree

status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Ibid.*; see also *ibid.* ("[I]t is unlikely that [retiree] benefits . . . would be left to the contingencies of future negotiations"). Although a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support in a given case. 12 Williston §34:3; accord, *Robinson* v. *United States*, 13 Wall. 363, 366 (1872); *Oelricks* v. *Ford*, 23 How. 49, 61–62 (1860). *Yard-Man* relied on no record evidence indicating that employers and unions in that industry customarily vest retiree benefits. Worse, the Court of Appeals has taken the inferences in *Yard-Man* and applied them indiscriminately across industries. See*, e.g., Cole, supra*, at 1074 (automobile); *Armistead* v. *Vernitron Corp.*, 944 F. 2d 1287, 1297 (CA6 1991) (electronics); *Policy, supra*, at 618 (steel).

Because the Court of Appeals did not ground its *Yard-Man* inferences in any record evidence, it is unsurprising that the inferences rest on a shaky factual foundation. For example, *Yard-Man* relied in part on the premise that retiree health care benefits are not subjects of mandatory collective bargaining. Parties, however, can and do voluntarily agree to make retiree benefits a subject of mandatory collective bargaining. Indeed, the employer and union in this case entered such an agreement in 2001. App. 435–436. *Yard-Man* also relied on the premise that retiree benefits are a form of deferred compensation, but that characterization is contrary to Congress' determination otherwise. In ERISA, Congress specifically defined plans that "resul[t] in a deferral of income by employees" as pension plans, §1002(2)(A)(ii), and plans that offer medical benefits as welfare plans, §1002(1)(A). Thus, retiree health care benefits are not a form of deferred compensation.

Further compounding this error, the Court of Appeals has refused to apply general durational clauses to provisions governing retiree benefits. Having inferred that parties would not leave retiree benefits to the contingencies of future negotiations, and that retiree benefits generally last as long as the recipient remains a retiree, the court in *Yard-Man* explicitly concluded that these inferences "outweigh[ed] any contrary implications derived from a routine duration clause terminating the agreement generally." 716 F. 2d*,* at 1482–1483. The court's subsequent decisions went even further, requiring a contract to include a specific durational clause for retiree health care benefits to prevent vesting. *E.g., Noe*, *supra*, at 555. These decisions distort the text of the agreement and conflict with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties. See 1 W. Story, Law of Contracts §780 (M. Bigelow ed., 5th ed. 1874); see also 11 Williston §31:5.

Perhaps tugged by these inferences, the Court of Appeals misapplied other traditional principles of contract law, including the illusory promises doctrine. That doctrine instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract. See 3 Williston §7:7 (4th ed. 2008). But the Court of Appeals construed provisions that admittedly benefited some class of retirees as "illusory" merely because they did not equally benefit *all* retirees. See *Yard-Man*, *supra*, at 1480–1481. That interpretation is a contradiction in terms—a promise that is "partly*"* illusory is by definition not illusory. If it benefits some class of retirees, then it may serve as consideration for the union's promises. And the court's interpretation is particularly inappropriate in the context of collective-bargaining agreements, which are negotiated on behalf of a broad category of individuals and consequently will often include provisions inapplicable to some

category of employees.

The Court of Appeals also failed even to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises. See 3 A. Corbin, Corbin on Contracts §553, p. 216 (1960) (explaining that contracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time" (internal quotation marks omitted)). The court recognized that "traditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation," but asserted that "the duration of the benefit once clearly conferred is [not] subject to this stricture." *Yard-Man*, *supra*, at 1481, n. 2. In stark contrast to this assertion, however, the court later applied that very stricture to noncollectively bargained contracts offering retiree benefits. See *Sprague* v. *General Motors Corp.*, 133 F. 3d 388, 400 (CA6 1998) ("To vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language" (internal quotation marks omitted)). The different treatment of these two types of employment contracts only underscores *Yard-Man*'s deviation from ordinary principles of contract law.

Similarly, the Court of Appeals failed to consider the traditional principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Litton Financial Printing Div., Litton Business Systems, Inc.* v. *NLRB*, 501 U. S. 190, 207 (1991). That principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees. Indeed, we have already recognized that "a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's

expiration." *Ibid.* But when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.

C

There is no doubt that *Yard-Man* and its progeny affected the outcome here. As in its previous decisions, the Court of Appeals here cited the "context of . . . labor-management negotiations" and reasoned that the Union likely would not have agreed to language ensuring its members a "full Company contribution" if the company could change the level of that contribution. *Tackett I*, 561 F. 3d, at 490 (internal quotation marks omitted). It similarly concluded that the tying of eligibility for health care benefits to receipt of pension benefits suggested an intent to vest health care benefits. *Ibid.* And it framed its analysis from beginning to end in light of the principles it announced in *Yard-Man* and its progeny. See 561 F. 3d, at 489; see also *Tackett II*, 733 F. 3d, at 599–600.

We reject the *Yard-Man* inferences as inconsistent with ordinary principles of contract law. But because "[t]his Court is one of final review, not of first view," *Ford Motor Co.* v. *United States*, 571 U. S. ___, ___ (2013) (*per curiam*) (slip op., at 2) (internal quotation marks omitted), the Court of Appeals should be the first to review the agreements at issue under the correct legal principles. We vacate the judgment of the Court of Appeals and remand the case for that court to apply ordinary principles of contract law in the first instance.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–1010

———————

## M&G POLYMERS USA, LLC, ET AL., PETITIONERS *v.* HOBERT FREEL TACKETT ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[January 26, 2015]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, concurring.

Today's decision rightly holds that courts must apply ordinary contract principles, shorn of presumptions, to determine whether retiree health-care benefits survive the expiration of a collective-bargaining agreement. Under the "cardinal principle" of contract interpretation, "the intention of the parties, to be gathered from the whole instrument, must prevail." 11 R. Lord, Williston on Contracts §30:2, p. 27 (4th ed. 2012) (Williston). To determine what the contracting parties intended, a court must examine the entire agreement in light of relevant industry-specific "customs, practices, usages, and terminology." *Id.*, §30:4, at 55–58. When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further. *Id.*, §30:6, at 98–104. But when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties. *Id.*, §30:7, at 116–124.

Contrary to M&G's assertion, Brief for Petitioner 25, no rule requires "clear and express" language in order to show that parties intended health-care benefits to vest. "[C]onstraints upon the employer after the expiration date of a collective-bargaining agreement," we have observed,

may be derived from the agreement's "explicit terms," but they "may arise as well from . . . implied terms of the expired agreement." *Litton Financial Printing Div., Litton Business Systems, Inc.* v. *NLRB*, 501 U. S. 190, 203, 207 (1991).

On remand, the Court of Appeals should examine the entire agreement to determine whether the parties intended retiree health-care benefits to vest. 11 Williston §30:4, at 55–57. Because the retirees have a vested, lifetime right to a monthly pension, App. 366, a provision stating that retirees "will receive" health-care benefits if they are "receiving a monthly pension" is relevant to this examination. *Id.*, at 415. So is a "survivor benefits" clause instructing that if a retiree dies, her surviving spouse will "continue to receive [the retiree's health-care] benefits . . . until death or remarriage." *Id.*, at 417. If, after considering all relevant contractual language in light of industry practices, the Court of Appeals concludes that the contract is ambiguous, it may turn to extrinsic evidence—for example, the parties' bargaining history. The Court of Appeals, however, must conduct the foregoing inspection without *Yard-Man*'s "thumb on the scale in favor of vested retiree benefits." *Ante,* at 10; see *International Union, United Auto, Aerospace, & Agricultural Implement Workers of Am.* v. *Yard-Man, Inc.*, 716 F. 2d 1476 (1983).

Because I understand the Court's opinion to be consistent with these basic rules of contract interpretation, I join it.